UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JOHN DOE I, JOHN DOE II, JOHN DOE III,
JOHN DOE IV, JANE DOE I, SUSAN E.
SCHUMANN, CHARLES RICHARDSON,
NANCY LESSIN, JEFFREY MCKENZIE,
REPRESENTATIVE JOHN CONYERS,
REPRESENTATIVE DENNIS KUCINICH,
REPRESENTATIVE JESSE JACKSON, JR.,
REPRESENTATIVE SHEILA JACKSON
LEE, REPRESENTATIVE JIM
MCDERMOTT and REPRESENTATIVE
JOSÉ E. SERRANO,

                Plaintiffs,

     v.

PRESIDENT GEORGE W. BUSH and
SECRETARY OF DEFENSE DONALD H.
RUMSFELD, each in their official capacity,
                Defendants.

Civil Action
No.

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
MOTION FOR A PRELIMINARY INJUNCTION**



**Table of Contents**

**Page**

I.   THE PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS
     BECAUSE CONGRESS HAS NOT DECLARED WAR AGAINST
     IRAQ.......................................................................... 2

     A.   The President Lacks Constitutional Authority To Commence War
          Absent Congressional Declaration............................... 2

     B.   Congress Has Taken No Action That Would Give The President
          The Power To Make War With Iraq........................... 6

          1.   The October Resolution Does Not Permit the President to
               Make War with Iraq...................................... 6

          2.   A Broader Reading of the October Resolution Would
               Render it Unconstitutional, So This Court Should Read
               it Narrowly...............................................12

          3.   Even if the October Resolution Complies with Constitutional
               Strictures, it Does Not Comply with the War Powers
               Resolution of 1973...................................... 18

II.  THE PLAINTIFFS WILL SUFFER IRREPARABLE HARM IF THE
     DEFENDANTS LAUNCH A MILITARY INVASION OF IRAQ
     ABSENT A CONGRESSIONAL DECLARATION OF WAR.................... 20

III. THE PUBLIC INTEREST WILL BE SERVED BY THE ISSUANCE
     OF AN INJUNCTION............................................... 24

IV.  A BALANCE OF THE HARMS WEIGHS DECISIVELY IN FAVOR
     OF THE PLAINTIFFS............................................ 24

     Conclusion......................................................... 24

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
## MOTION FOR A PRELIMINARY INJUNCTION

The Plaintiffs, including United States soldiers, parents of United States soldiers, and Members of Congress, seek to enjoin the Defendant President George W. Bush and Defendant Secretary of Defense Donald H. Rumsfeld from launching a military invasion of Iraq without the Congressional declaration of war required by the Constitution.

This case is of enormous and immediate public interest. Article I, § 8 of the United States Constitution states that "Congress shall have Power…[t]o declare War." The framers of the Constitution included this clause to ensure that the awesome power to send this nation into war would not be given to the single person heading the Executive Branch but rather would be reserved for the elected body of the United States Congress. Congress has not declared war against Iraq. The October 2002 Joint Resolution of Congress was not a declaration of war. The defendants' plans for an imminent military invasion of Iraq, absent a Congressional declaration of war, demand immediate judicial intervention.

### Argument

The Plaintiffs are entitled to a preliminary injunction because they have shown that 1) they are likely to succeed on the merits of their claim; 2) they will suffer irreparable harm in the absence of the requested injunction; 3) the balance of equities favors the grant of an injunction; and 4) the public interest would be served by an injunction. *Cablevision, Inc. v. Public Improvement Comm'n of Boston*, 184 F.3d 88, 95 (1st Cir. 1999); *Philip Morris, Inc. v. Harshbarger*, 159 F.3d 670, 673 (1st Cir. 1998).

## I.   THE PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS BECAUSE CONGRESS HAS NOT DECLARED WAR AGAINST IRAQ.

### A.   The President Lacks Constitutional Authority To Commence War Absent A Congressional Declaration.

The Constitution vests the power to commence war exclusively in Congress.

Article I, § 8, cl. 11 states that "Congress shall have Power ... [t]o declare War."

Numerous other provisions specifically reserve to Congress the powers necessary to

commence a war. *See* U. S. Const. art. I, § 8, cl. 1, 11–16; *id.* § 9, cl. 7; 1 *The Works of*

*James Wilson* 433 (R. McCloskey ed. 1967) ("[A]ll these are powers naturally connected

with the power of declaring war.  All these powers, therefore, are vested in Congress.").

Article II, § 2, cl. 1, makes the President "Commander in Chief of the Army and Navy."

His position at the top of the military hierarchy only gives him power to make war once

Congress has declared war or taken equivalent action, and then only within the limits

Congress prescribes.  *See Fleming v. Page*, 50 U.S. (9 How.) 603, 615 (1850) (holding

that a Congressional declaration of war conferred nothing more than the power of a

military commander on the President); *Little v. Barreme*, 6 U.S. (2 Cranch) 170 (1804)

(holding that in an undeclared war, the President's authority was limited to those acts

authorized by Congress); *Talbot v. Seeman*, 5 U.S. (1 Cranch) 1, 8 (1801) (noting that the

Constitution vests "[t]he whole powers of war" in Congress); *Bas v. Tingy*, 4 U.S. (4

Dall.) 37, 40 (1800) (Washington, J.) (recognizing Congress's power to authorize

undeclared wars); *see also Ex parte Milligan*, 71 U.S. (4 Wall.) 2, 139 (1866) (Chase,

C.J., concurring) ("Congress has the power not only to raise and support and govern

armies but to declare war. ... This power necessarily extends to all legislation essential to

the prosecution of war with vigor and success, except such as interferes with the

2

command of the forces and the conduct of campaigns. That power and duty belong to the

President as commander-in-chief.")

The framers clearly intended this division of authority. *See, e.g.*, 6 *The Writings*

*of James Madison* 148 (G. Hunt ed. 1906); *The Federalist* No. 69, at 448 (Hamilton) (J.

Cooke ed., 1982). The original wording of the Declare War Clause gave Congress the

power to "make war," but the framers changed the language to "declare war" for two

reasons. They wanted to make clear that the President, as Commander in Chief, would be

responsible for day-to-day conduct of any Congressionally authorized war, and that the

President could use the armed forces to "repel sudden attacks" without Congressional

authorization. *See* 2 *The Records of the Federal Convention of 1787*, at 318–319 (M.

Farrand, ed. 1911); Lofgren, *War-Making Under the Constitution: The Original*

*Understanding*, 82 Yale L.J. 672, 675–83 (1972).

The political branches have respected this division throughout most of the

nation's history. While there have been numerous undeclared wars, common even in the

framers' time, most of them were statutorily authorized by Congress. *See* S. Rep. No.

797, 90th Cong., 1st Sess. 23 (1967) ("[T]he practice of American Presidents for over a

century after independence showed scrupulous respect for the authority of the Congress

except in a few instances"); Ely, *War and Responsibility: Constitutional Lessons of*

*Vietnam and Its Aftermath* 147 n.54 (1993). While in the last half-century presidents

have increasingly asserted "inherent" war-making power, Congress has acted to authorize

such wars. *See Da Costa v. Laird*, 448 F.2d 1368 (1971). In fact, Justice Black, in his

opinion for the Court in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587–88

(1952), expressly denied that the "executive power" in Article II, § 1, cl. 1 vested any

general war-making power in the Executive.  In any case, the Executive Branch cannot

appropriate a power that the Constitution expressly reserves to Congress, without, at the

least, "a systematic, unbroken, executive practice, long pursued to the knowledge of the

Congress and never before questioned." *Youngstown*, 343 U.S. at 610 (Frankfurter, J.,

concurring).  No such practice justifies the currently threatened invasion of Iraq.

The framers' rationale for separating the power to <u>declare</u> war – vested in

Congress – from the power to wage a declared war – given to the President as

commander-in-chief – remains compelling today. *See generally* Ely, *War and*

*Responsibility* 3–4.  First, war was not to be entered into lightly, and thus required "the

utmost deliberation, and the successive review of all the councils of the nation." 2 Justice

Story, *Commentaries on the Constitution of the United States* §§ 1166 (1833).  Second,

the inclusion of *both* houses (usually only the Senate participates in foreign affairs

decisions) would slow down, by design, the decisionmaking process.  As James Wilson

said: "This system will not hurry us into war; it is calculated to guard against it." 2

*Debates in the Several State Conventions on the Adoption of the Federal Constitution*

528 (J. Elliott ed. 1863).  Third, the inclusion of the House ("the people's house")

ensured that the war would have the support of the public at large. Ely, *War and*

*Responsibility* 3–4.  Since the nation's founding, the need to exercise caution in entering

war has increased, while the barriers to commencing hostilities have largely crumbled.

War has become more destructive; the speed with which the President may deploy troops

or launch a strike has increased dramatically; the nation not only has a standing army, but

one composed primarily of volunteers; and Congress has more staff and spends more of

the year in session than in earlier centuries, and thus can proceed more quickly. *See* Ely,

4

*War and Responsibility* 7–9. Congressional deliberation remains a primary safeguard against the "dogs of war."

Similarly, the constitutional allocation of the war power serves several overarching structural values, all of which have increased in relevance over time. First, while the Constitution seeks to create an effective national government, it also seeks to preserve individual liberty and local autonomy by limiting the national government's enumerated powers and dividing those powers among the three branches of government. Apart from popular election, the most obvious distinction between the British monarch and the American President was the latter's lack of authority to commence war. This difference arose out of a conscious recognition that war tends to shift power from the legislative and judicial branches toward the executive, and from the state governments toward the national government, while it creates an environment more hostile to individual liberty. As the power of the national government and the presidency has grown over the last century, the need to retain the remaining bulwarks against executive and federal aggrandizement and encroachment has increased. *Cf., e.g., Alden v. Maine*, 527 U.S. 706 (1999); *Printz v. United States* 521 U.S. 898 (1997); *Seminole Tribe v. Florida*, 517 U.S. 44 (1996); *United States v. Lopez*, 514 U.S. 549 (1995); *New York v. United States*, 505 U.S. 144 (1992). Second, the governmental procedures set out in the Constitution ensure the accountability of government, and the Supreme Court has grounded its enforcement of separation of powers and federalism in this value. *See, e.g., New York* , 505 U.S. at 168–69, 177, 182–83 (striking down a statutory provision that "commandeered" state legislatures in a way that would allow both federal and state

legislators to avoid being held accountable for the choice of location for radioactive waste disposal sites).

**B.      Congress Has Taken No Action That Would Give The President The Power To Make War With Iraq.**

No Congressional statute, action, or combination of statutes or actions has commenced war with Iraq or given the President the authority to commence such a war. The resolution passed by Congress last October (the "October Resolution") has been cited as a sufficient proxy for a Congressional commencement of war, but the Resolution's language, context, and legislative history show that it is not a declaration of war. In particular, it expresses three basic ideas: Congress supports the President's diplomatic efforts; Congress authorizes the President to use limited force as necessary to protect American and United Nations troops; and should the Security Council determine that use of force is necessary, Congress likely will supply the constitutionally required declaration of war or equivalent action *at that time*. This narrow reading is further justified, because a broad reading would render the Resolution unconstitutional.

**1.      The October Resolution Does Not Permit the President to Make War with Iraq.**

In the October Resolution, Congress sought to support the President in international diplomatic efforts to bring Iraq into compliance with United Nations Security Council resolutions, not to commence hostilities with Iraq. First, nearly two-thirds of the paragraphs in the preamble refer to Iraq's violations of international law, and how important it is for the United States to work with the international community, subject to the strictures of international law and to consensus within international

6

organizations, to remedy these violations.[1]  Second, in § 2, "Support for United States

Diplomatic Efforts," Congress expresses support for presidential efforts to enforce

Security Council resolutions regarding Iraq <u>only through the Security Council itself.</u>

Nowhere does Congress contemplate action outside of that diplomatic process.  There is

no support for or discussion of bilateral negotiation between the United States and Iraq,

or of the possibility of unilaterally going to war with Iraq.

The Resolution authorizes the President to use United States Armed Forces to

"defend the national security of the United States ... <u>and</u> [as opposed to "or"] enforce all

relevant United Nations Security Council resolutions regarding Iraq."  Pub. L. No. 107-

243, § 3(a), 116 Stat. at 1501 (emphasis added).  Throughout the preamble, Congress

invariably ties United States national security and "international peace and security" to

one another – they are closely intertwined concerns, both of which Congress seeks to

address through a single process of international cooperation.  *See* Pub. L. No. 107-243,

preamble ¶ 23, 116 Stat. at 1500 ("[I]t is in the national security interests of the United

States to restore international peace and security to the Persian Gulf region."); *id.* ¶¶. 1,

5–6, 19, 116 Stat. at 1498, 1500.  Thus, the Resolution authorizes the President to work

---

[1] *See* Pub. L. No. 107-243, preamble ¶ 1, 116 Stat. 1498, 1498 (October 16, 2002) (referring to Iraq's
"illegal occupation of Kuwait" and the United States's efforts to "enforce United Nations Security Council
resolutions" as part of "a coalition of nations"); *id.* ¶¶ 2–4 (referring to Iraq's violations of the "United
Nations sponsored cease-fire agreement" and "attempt[s] to thwart the efforts of [United Nations] weapons
inspectors"); *id.* ¶¶ 5–7, 116 Stat. at 1498–99 (conveying Congress's continuing sense that Iraq is
threatening "international peace and security," "breach[ing] its international obligations" to comply with
Security Council resolutions regarding weapons, treatment of the domestic population, and detention of
non-Iraqi citizens); *id.* ¶ 9, 116 Stat. at 1499 (noting attacks on "Coalition Armed Forces engaged in
enforcing the resolutions of the United Nations Security Council"); *id.* ¶¶ 14–16, 116 Stat. at 1499–1500
(describing Congressional and Security Council resolutions intended to ensure enforcement of Iraq's
international obligations, as expressed United Nations Security Council Resolutions 660, 661, 662, 664,
665, 666, 667, 669, 670, 674, 677, 678, 687, 688, and 949); *id.* ¶¶ 18–19, 116 Stat. at 1500 (supporting
President Bush's expressed desire to "work with the United Nations Security Council to meet our common
challenge," to pass "necessary resolutions," and to enforce Security Council resolutions); *id.* ¶¶ 23, 116
Stat. at 1500 (reaffirming the desire to "restore international peace and security").

with the Security Council to implement diplomatic actions, and to determine whether the use of force is likely to be necessary.

It is hardly surprising that the Resolution should fail to contemplate use of force outside of a United Nations coalition, given the international legal context within which the Resolution sets itself.  Under the United Nations Charter, to which the United States is a party and under which the United Nations Security Council operates, there are only three justifications for a state to use force against another state: self-defense; defense of another state; and action to protect international peace and security, <u>when authorized by the United Nations Security Council</u>.  United Nations Charter, art. 2, para. 4 (requiring all Members to "refrain from the threat or use of force against the territorial integrity or political independence of any state"); *id.* art. 51 (permitting "individual or collective self-defense if an armed attack occurs against a [Member state], until the Security Council has taken the measures necessary to maintain international peace and security"); *id.* art. 39–42 (empowering the Security Council to authorize the use of force "to maintain or restore international peace and security," but only as a last resort).  The Resolution refers repeatedly to Iraq's violations of international law, particularly in the form of unlawful aggression against other nations and its own population, and to the need to bring Iraq into compliance with the Security Council's demands, through the efforts of the Security Council.  It would be anomalous to condemn Iraq's failure to comply with the United Nations Charter and with Security Council resolutions passed thereunder, while at the same time authorizing the President himself to act outside of the same international legal framework.

This Court need not decide the difficult question whether the United Nations Charter or customary international law would forbid Congress from unilaterally declaring a non-defensive war or from permitting the President to do so; what matters here is that the Resolution orders the President to operate within the Charter's strictures. By means of the Resolution, Congress has stated that it will adopt the United Nations's standards as its own.

Furthermore, while the Resolution does support the President's work within the Security Council, it does not permit the President to attack Iraq, even with United Nations Security Council approval. Such a conditional grant of authority to use force unconstitutionally would delegate Congress's power to commence war to the President (if not to the United Nations Security Council). *See infra*. Rather, the grant is best understood as accomplishing two things. It permits the President to use limited force to respond to Iraqi attacks on American or United Nations troops in the region, and it conveys the message that should the Security Council advocate the use of force, the Congress would be willing to support that determination, at the time it is made, through the constitutionally required declaration of war or equivalent action.[2]

This structural emphasis on exhausting diplomatic means, using the least amount of force necessary to accomplish United Nations goals, and working within the United Nations framework makes clear that the authorization for the President "to use the Armed

---

[2] This reading is especially plausible in light of the history of troop deployment. Congress is merely providing necessary approval for the President's deployment of troops in an unstable region and his potential use of force to protect those troops. Such deployment might otherwise be unconstitutional. While Congress's powers to raise and direct armies and to commence war include the power to direct deployment of troops, Congress has traditionally given the President discretion to deploy troops as part of his exercise of the foreign affairs power he shares with Congress. However, when President Polk deployed troops in such a manner as to encourage the attack that commenced the Mexican War, thus effectively usurping Congress's authority to determine when wars should commence, the House of Representatives censured him for unconstitutional behavior. *See* Ely, *War and Responsibility* 96, 143 n.22.

Forces ... as he determines to be necessary and appropriate" is in fact quite narrow. Pub.

L. No. 107-243, 116 Stat. at 1501. The same can be said for the declaration that the

Resolution "constitute[s] specific statutory authorization" under the War Powers

Resolution, and the contemplation that after the use of force, planning for Iraq's

transition to democracy might be necessary under the Iraq Liberation Act of 1998. Pub.

L. No. 107-243, §§ 3(c)(1) & 4(a), 116 Stat. at 1501. These provisions must be

understood as expressing Congress's sense of what  ultimately may become necessary,

and as a signal that Congress will likely approve whatever force is deemed necessary

when the time for decision comes.

The legislative history of the October Resolution supports the above reading of

the statutory text.[3]  The House International Relations Committee concluded that the

Resolution should permit use of military force in Iraq only "under certain circumstances."

H.R. Rep. No. 107-721, at 4 (2001). The Committee took the view that "providing the

President with the authority he needs to use force is the best way to avoid its use," to

"persuade Iraq to meet its international obligations," and "to persuade members of the

Security Council and others in the international community to join us in bringing pressure

on Iraq ...."  H.R. Rep. No. 107-721, at 4–5. The Committee also limited the President's

---

[3] There are in fact two elements in the legislative history that appear inconsistent with its otherwise clearly expressed intent. The first is the suggestion that "the President has authority under the Constitution to take action in order to deter and prevent acts of international terrorism against the United States." H.R. Rep. 107-721, at 8. This statement can be understood as a mere restatement of the well-accepted idea that the President has the authority to "repel sudden attacks." To the extent it constitutes a broader understanding of Executive authority, it is neither an accurate nor a binding statement of constitutional doctrine, nor is it necessarily inconsistent with the idea that the President will almost certainly have to come back to Congress for a declaration of war or equivalent act. If attacking Iraq were somehow necessary to prevent terrorism, Congress would have demanded that the President do so months ago, and he would have obliged.

The second is the statement that "[t]he resolution would leave the decision to use force to the discretion of the President." H.R. Rep. 107-721, at 40. This statement should be read as a statement that Congress will not declare war unless the President feels it is necessary. After all, Congress's delegation of that sort of discretion would be unconstitutional. In any case, the statement comes from the Congressional Budget Office, not the Committee itself, and is thus by no means representative of the Committee's views.

10

authority to actions taken "in accordance with the Constitution and relevant laws of the United States." H.R. Rep. No. 107-721, at 6.  Thus the President could not exercise war-making authority that Congress was unable to grant him.  The Committee also expressed approval of the President's stated commitment "to work with the U. N. Security Council." H.R. Rep. No. 107-721, at 7–8 (internal quotation marks omitted).  The Committee clearly did not contemplate war at the time, given the absence of any appropriation for present or future warmaking, H.R. Rep. No. 107-721, at 39–40.

Finally, the resolution should be read in light of the events surrounding the time of its passage.  Subsequent to the resolution's passage, the United States spearheaded United Nations approval of Resolution 1441 that imposed a new inspections program.  In recent weeks, it has become increasingly clear that the United States' decision whether or not to go to war should turn on two crucial assessments.

The first must be a careful appraisal of the results of the United Nations inspections program now underway, including the nature of Iraq's cooperation and disclosure.  The second and ultimate judgment will require weighing the implication of the inspections' results, and any other information about the threat Iraq poses to the United States, against the full costs of going to war.  Those costs include: combat and civilian casualties; prolonged occupation and reconstruction of Iraq; the impact on stability in the region; the impact on the nation's diplomatic relations; the impact on the U.S. war against Al Qaeda; and the impact on funds available for Homeland Security and other domestic needs.

Clearly, these are not merely military judgments for the Commander in Chief. They are precisely the kind of complex national policy decisions that the framers

11

conferred on the Congress in matters of war and peace. Yet, in the present circumstances, if an injunction is not issued, the Congress will play no real role in the fateful determination that is their most profound prerogative and responsibility under the Constitution.

### 2. A Broader Reading of the October Resolution Would Render it Unconstitutional, So This Court Should Read it Narrowly.

Any interpretation of the Resolution broader than the one above would render the Resolution unconstitutional. The Supreme Court has stated on numerous occasions (famously in Justice Brandeis's concurrence in *Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 348 (1936)) that when a statute has multiple plausible meanings, a court should construe it to avoid raising serious constitutional problems. *See, e.g., Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988). The Court has also developed a number of canons of construction to protect various constitutional values, many of which apply here. A vague Resolution, unaccompanied by any provision for appropriations or a draft, does not constitute a clear statement of Congressional intent to make war with Iraq. *See DaCosta v. Laird*, 448 F.2d 1368, 1369 (1st Cir. 1971) (holding that Congress's continued military appropriations and extension of the draft constituted "ratification" and "approval" of executive actions in Vietnam, even after the repeal of the Tonkin Gulf Resolution).

First and most importantly, Congress may not delegate to the President the decision to commence a war, and if the October Resolution does so, it is unconstitutional. The Constitution plainly lodges the power and responsibility for commencing war in Congress. If Congress can just "leave the decision to use force to the discretion of the President," H.R. Rep. 107-721, at 40, then it undermines the entire constitutional scheme.

A broad reading of the October Resolution would subvert the distinction made in the early cases, still influential today, between declared ("perfect") wars, in which the President and all citizens were authorized to make war against an enemy, and undeclared ("imperfect") wars, in which the President could only engage in actions specifically authorized by Congress. *Bas v. Tingy*, 4 U.S. (4 Dall.) 37, 40 (1800) (Washington, J.); *see Little v. Barreme*, 6 U.S. (2 Cranch) 170 (1804); *Talbot v. Seeman*, 5 U.S. (1 Cranch) 1, 8 (1801); discussion *supra*. There is an obvious tradeoff in this dichotomy. Because Congress may not devote the same amount of deliberation and solemnity to undeclared wars as it does to declared ones, the safeguards of prudence and delay give way to the safeguards that come with cabining of the President's war-making discretion. The October Resolution neither makes a solemn declaration of war nor limits the acts of war the President may commit.

Indeed, war may be waged only after considered deliberation by both of the political branches. However, Section 3 of the October Resolution, read broadly, allows the President to make the decision entirely by himself. Section 3 purports to "authorize" the President to use the Armed Forces "as he determines to be necessary and appropriate," if he decides that "diplomatic or other peaceful means" will not work and that the use of force is "consistent" with national and international attempts to fight terrorism. Abraham Lincoln's words make it clear what is at stake:

> Allow the President to invade a neighboring nation whenever he shall deem it necessary to repel an invasion, and you allow him to do so whenever he may choose to say he deems it necessary for such purpose – and you allow him to make war at pleasure. Study to see if you can fix any limit to his power in this respect, after you have given him so much as you propose.

Letter from Abraham Lincoln to William H. Herndon (Feb. 15, 1848), in 1 *The Collected Works of Abraham Lincoln* 451, 451-52 (R. Basler ed., 1953).

It is no answer to say that Congress remains free to stop any war that the President might commence. When Congress vests discretion in the President to start a war, the default condition switches from peace to war, in a way that separation of powers principles cannot permit. *Cf. Heckler v. Chaney*, 470 U.S. 821, 832 (1985) (holding that unlike administrative action, agency inaction is generally not subject to judicial review, in part because inaction "generally does not exercise its <u>coercive</u> power over an individual's liberty or property rights"). In *INS v. Chadha*, the Supreme Court rightly rejected Justice White's claim that the legislative veto regime was functionally equivalent to Article I procedures, in part because the regime changed the default. 462 U.S. at 952; *id.* at 990 (White, J., dissenting). It was true that, if all three branches agreed, then an otherwise deportable alien could remain in the country. However, in the case of legislative disagreement when the Executive made such an exception, the legislative veto allowed a majority vote by one house of Congress to achieve what would otherwise likely require sufficient super-majorities in both Houses to override an Executive veto. In the present context, one can imagine a scenario where, several months from now, the President wants to go to war, but majorities in both houses do not. Absent a delegation to the President of war-making authority, Congress need only refuse to act, in order to prevent war. With discretion vested in the President, Congress would need at least to mobilize majorities in both houses, and would probably need veto-proof majorities.

In the context of war, the change in the default condition has more than merely mathematical consequences. In light of the President's enormous power to shape public

14

opinion, it is difficult for Congress to summon a bare majority to resist Executive

pressure to commence a war.  Once a President actually commences a war, he has

momentum on his side, and can accuse dissenters of refusing to "support the troops";

these together make effective Congressional resistance even harder to accomplish.  For

similar reasons, Congress's power of the purse does not constitute an effective check on

discretionary Executive war-making.  Even if it did, "the fact that one [branch] has

mechanisms available to guard against incursions into its power by other [branches] does

not require that the Judiciary remove itself from the controversy by labeling the issue a

political question." *United States v. Munoz-Flores*, 495 U.S. 385, 393 (1990).

Congressional delegation of war-making power also undermines the guarantees

that a war will have widespread popular support and that legislators will be held

accountable for the decision to go to war.  Of course, the President is popularly elected,

and will be held accountable regardless of whether Congress is, but that is precisely the

point.  The President's motivations remain the same whether Congress participates in the

decision or not.  The mere fact that Congress does not wish to make the decision about

whether to go to war does not absolve it from deciding.  *See New York v. United States*,

505 U.S. at 168–69, 177, 182–3.  If that means the country cannot go to war, so be it.  It

is no accident that the Constitution provides no mechanism for the Executive to make war

(except to repel sudden attacks), should Congress be unwilling to start a war.

Finally, vesting the President with the discretion to start a war also removes

whatever braking effect Congressional deliberations might have on the speed with which

the nation enters war.  The war will start the moment President Bush makes his decision.

The problems with broad delegation of war-making authority are nicely illustrated by the most recent instance where Congress afforded a president virtually unbounded discretion to make war – the Gulf of Tonkin Resolution, Pub. L. No. 88-408, 73 Stat. 384 (1964). The language is startlingly similar to that in the October Resolution: "[T]he United States is ... prepared, *as the President determines*, to take all necessary steps, including the use of armed force, to assist any member of protocol state of the Southeast Asia Collective Defense Treaty." Pub. L. No. 88-408, 73 Stat. at 384 (emphasis added). After its passage, President Johnson claimed broad authority under it and plunged the nation into a war that killed 58,000 Americans and at least one million Vietamese. *See* Meyerson, "Decision on war belongs to Congress," *Baltimore Sun*, at 21A (Oct. 9, 2002); Ely, *War and Responsibility* 13. Once President Johnson had enmeshed troops in the conflict, it took nearly seven years for Congress to repeal the resolution (war was the default and the President had inertia on his side). Even then, President Nixon still did not end the war (the President gains strength in war time, and can check Congressional efforts to end war). Meyerson, "Decision on war belongs to Congress," *Baltimore Sun*, at 21A. By leaving the decision as to when to go to war to the President, Congress failed to ensure that the Vietnam War would have widespread public support, with disastrous consequences.

The comparison with Vietnam is instructive for two additional reasons. First, in the Vietnam era Congress continued to appropriate money and authorize the draft, making it clear that a state of war existed. *See DaCosta v. Laird*, 448 F.2d 1368, 1369 (1st Cir. 1971). With regard to Iraq, in contrast, it is not at all clear that the United States is at war with Iraq, and no appropriation has been made. This sort of ambiguity flies in

the face of the constitutional values discussed above, and demonstrates that the October

Resolution is constitutionally deficient as a declaration of war.

Second, the war in Iraq is one of the most obvious instances in this nation's

history where the requirements of the Declare War Clause should be scrupulously

observed.  The President has contemplated invasion, occupation, and "regime change" in

Iraq.  The only way to make more total war against Iraq would be to destroy it utterly.  A

commitment like that requires a clear statement by Congress.  The only instance in recent

memory where the United States engaged in such an invasive war was in Afghanistan,

and that was in response to one of the most significant military emergencies the United

States has experienced since the bombing of Pearl Harbor.  Presumably, if the President

or Congress thought that Iraq truly posed an imminent threat to national security, we

already would be at war.  These observations demonstrate two related aspects of the

potential war in Iraq – the opportunity the United States government has had for

premeditation, and the comparative lack of emergency.  In World War I, the Korean War,

and the Vietnam War, the United States was responding to threats to strategic allies.  In

World War II and Afghanistan, it was responding to direct attacks on the homeland.  But

here, the United States is contemplating a preemptive total war against a country that

does not appear, at least from the conduct of the political branches, to pose an imminent

threat to the United States or its allies.  If ever there was a time in history for a court to

"state what the law is," Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177 (1803), it is

now.

17

### 3. Even if the October Resolution Complies with Constitutional Strictures, it Does Not Comply with the War Powers Resolution of 1973.

The War Powers Resolution of 1973 requires "specific statutory authorization" before the President can make war. Pub. L. 93-148, 87 Stat. 555 (1973). The alternative grounds for hostilities – a congressional declaration of war or "a national emergency created by attack upon the United States, its territories or possessions, or its armed forces" – do not apply in this instance. It is clear that unless repealed, these requirements can bind future Congresses, and that the October Resolution both claims to constitute "specific statutory authorization" and expressly denies that it in any way "supersedes any requirements of the War Powers Resolution."

However, the October Resolution is not in fact "specific" enough to meet the requirements of the War Powers Resolution, as they emerge from an analysis of purpose and context. The War Powers Resolution was passed near the end of the Vietnam War, in an effort to ensure that in the future Congress would be less likely to abdicate its constitutional responsibility to decide whether the nation should go to war. Ely, *War and Responsibility* 48. In other words, the purpose of the War Powers Resolution is to prevent future Vietnams.

There are several mechanisms by which the War Powers Resolution sought to achieve this end: requirement that the President report to and consult with Congress regularly throughout the duration of any hostilities (§§ 3–5); requirement that the President withdraw troops within 60 days (which can be and probably would virtually always be extended by 30 days), unless Congress affirmatively authorizes continued hostilities (§5(b)); allowing a legislative veto to halt hostilities at any time (likely invalid under *Chadha*, but separable under § 9) (§5(c)); establishing an interpretive rule that no

18

statute or treaty shall be construed to infer authorization to introduce American troops into hostilities (§ 8).

From this scheme emerges two basic lines of defense against future Vietnams, and they shed light on the meaning of "specific statutory authorization."  The first includes efforts to ensure accountability once a military engagement has begun (consultation, reporting, Congressional approval within 60–90 days).  The second includes efforts to prevent military engagement and, more importantly, escalation in the first place (specific conditions under which hostilities can commence).  In this latter category, the canon of *ejusdem generis* requires that the "specific statutory authorization" requirement be interpreted in light of the alternative avenues to hostilities.  On the one hand, a congressional declaration of war is a clear and solemn statement committing the nation to war – a statement for which the Congress can absolutely be held accountable.  On the other, a response to an armed attack on the United States, its possessions, or its troops is the most clearly recognized exception to the Congressional declaration requirement, and a response for which the President can be held absolutely accountable.  Thus, if § 2 of the War Powers Resolution is to be something more than a dead letter, <u>a "specific statutory authorization" must create both the obvious state of war and the clear location of responsibility that a declaration or armed attack would.</u>

The October Resolution demonstrates no such clarity.  No one could read it and tell whether the nation was in fact at war.  Read broadly, it grants discretion to the President in such a way that no one would know where to locate responsibility, were a war to commence.  In fact, the October Resolution gives the President the same kind of discretion to escalate hostilities, merely by asserting his opinion that such action is

19

"necessary and appropriate," that the Gulf of Tonkin Resolution did. The War Powers Resolution can be understood as an attempt to ensure that no Congress would ever again give this kind of war-making discretion to a President, yet that is precisely what the October Resolution (read broadly) does.

For all of the above reasons, the Plaintiffs are likely to succeed on the merits of their claims.

## II.     THE PLAINTIFFS WILL SUFFER IRREPARABLE HARM IF THE DEFENDANTS LAUNCH A MILITARY INVASION OF IRAQ ABSENT A CONGRESSIONAL DECLARATION OF WAR.

By waging war against Iraq absent a Congressional declaration of war, the Defendants will endanger the lives of Plaintiffs John Doe I, John Doe II, John Doe III, the sons of Plaintiffs John Doe IV and Jane Doe I, Susan E. Schumann, Charles Richardson and Nancy Lessin, Jeffrey McKenzie and tens of thousands of similarly situated United States soldiers in an illegal and unconstitutional war. If the injunction is not granted, Plaintiff-soldiers and family members will suffer irreparable harm, including death, loss of family members, serious injury, and psychological trauma associated with the horrors of war.

By waging war against Iraq absent a Congressional declaration of war, Defendants will deny Plaintiff-Members of Congress their right, under Article I § 8 of the United States Constitution, to vote on whether or not to declare war. If the injunction is not granted, Plaintiff-Members of Congress will suffer irreparable harm as they will be prevented from exercising this constitutional right and from representing their constituents in the decision of whether or not to send this nation into war.

To prevail on their motion for preliminary injunction, the plaintiffs must demonstrate that the threatened injury is "not remote or speculative, but is actual and imminent." *Sierra Club* v. *Larson*, 769 F. Supp. 420, 422 (D. Mass. 1991). The injury must be of such imminence that there is a clear and present need for relief to prevent irreparable injury. *Id.* The President, the Secretary of Defense and the Secretary of State have made it unmistakably clear that an invasion of Iraq is imminent and have voiced no intention of seeking a Congressional declaration of war. The threat of irreparable harm against the plaintiffs is not speculative, but a virtual certainty in the immediate future.

The drumbeat of war sounds more deafening by the day. President Bush set the stage in his State of the Union address on January 28, 2003, stating that Saddam Hussein had missed his "final chance" by showing contempt for United Nations weapons inspections. State of the Union Address, http://www.whitehouse.gov/news/releases/2003. He emphasized that the administration reserved the right to unilaterally decide to invade Iraq, proclaiming that "[t]he course of this nation does not depend on the decisions of others." *Id.* The Congress and members of the media clearly understood his message. *See, e.g.,* Remarks of Senator Bingaman, 149 Cong. Rec. S1767-01 (Jan. 30, 2003) ("as I understood the President in his State of the Union speech earlier this week, it is his intention to begin military action against Iraq sometime in the near future"); Dana Milbank and Mike Allen, *Bush Stiffens Warning of War With Iraq*, Wash. Post (Jan 29, 2003) at A, 2003 WL 10893702 ("President Bush took the nation to the edge of war with Iraq last night").

Anticipating the President's address, Secretary of State Colin Powell declared on January 24, 2003 that "[t]he question isn't how much longer do you need for inspections

to work.  Inspections will not work." Glenn Kessler, *Moderate Powell Turns Hawkish on War With Iraq*, Wash. Post (Jan. 24, 2003) at A, 2003 WL 10892661.  After his presentation to the United Nations on February 5, 2003, Secretary Powell informed the Senate that "within weeks" the Iraqi situation would be brought to a conclusion "one way or another."  Barry Schweid, *Powell sees inspectors visit as key to Iraqi situation*, Associated Press (February 6, 2003) *at* http://www.westlaw.com/ALLNEWSPLUS/2-6-03 ApWires.  Shortly thereafter, Secretary of Defense Rumsfeld suggested the timetable for invasion could be even shorter, coming with "days or weeks." Carol Giacomo, *Rumsfeld says time running out for Iraq* (Feb. 8, 2003) *at* http://www.Reuters.Co.UK/News Articles.World News & Story, ID 2192950.

Since Secretary Powell's presentation to the United Nations on February 5, 2003, the President has begun to issue daily threats that imminent hostilities will soon commence against Iraq.  On February 6, 2003, the President announced that "[w]e will not wait to see what terrorists or terrorist states could do with chemical, biological, radiological or nuclear weapons.  Saddam Hussein can now be expected to begin another round of empty concessions, transparently false denials.  No doubt, he will play a last-minute game of deception.  The game is over." *World Can Rise to This Moment*, White House Press Release (February 6, 2003) *at* http://www.whitehouse.gov/news/releases/2003 (emphasis added).  On February 7, 2003, he warned the United Nations to "make up its mind soon" because the United States would not wait long before leading a coalition to disarm Saddam Hussein.  Barry Schweid, *Bush urges U.N. to "make up its mind soon" on Iraq*, Associated Press (Feb. 7, 2003) *at* http://www.westlaw.com/ALLNEWSPLUS/2-7-03 ApWires.  One day

22

following deployment of a fifth aircraft carrier to the Gulf region and a State Department

advisory to United States diplomats to leave their posts in Israel, Syria, Jordan and

Lebanon for personal safety, President Bush stated that "[t]he United States, along with a

growing coalition of nations, will take whatever action is necessary to defend ourselves

and disarm the Iraqi regime." Adam Entous, *Bush says will act if U.N. balks* (February 9,

2003), *at* http://www.Reuters.co.UK/NewsArticles/World News & Story ID 2193602.

Echoing his earlier reference to a "game," President Bush stated on February 10, 2003

"[Saddam] wants the world to think that hide and seek is a game that we should play.

And it's over." White House Press Release, February 10, 2003,

http://www.whitehouse.gov/news/releases/2003 (emphasis added). Arab leaders have

now abandoned diplomatic efforts to prevent war and are bracing for an imminent

conflict any day after February 15, 2003. Rana Sabbagh-Gargour, *Leaders braced for an

imminent war*, Times OnLine (February 10,2003) *at* http://www.timesonline.co.uk.

As a result of the administration's plans to commence hostilities in Iraq possibly

"within days," according to Secretary Rumsfeld, the plaintiff soldiers will be placed in

harm's way and the plaintiff parents of soldiers will suffer the risk of death or injury to

their children in an undeclared, unauthorized and unconstitutional war. The

constitutional right and authority of plaintiff Congressional representatives to decide

whether to declare war will be irreparably harmed. The threat of harm to all plaintiffs is

actual and imminent, and supports their request for this Court to grant immediate

injunctive relief.

### III.   THE PUBLIC INTEREST WILL BE SERVED BY THE ISSUANCE OF AN INJUNCTION.

The decision whether to send United States armed forces into war is a momentous decision for this nation.  The public has a clear and immediate interest in participating in that decision through their representation by Senators and Representatives in Congress, as required by the Constitution.

A war against Iraq may result in thousands of deaths of United States soldiers and Iraqi citizens.  If this war is commenced in violation of the Constitution, it will severely undermine the rule of law and the separation of powers that the framers of the Constitution carefully designed.  The public has an interest in ensuring that the Constitution is upheld, especially in matters of war and peace.  The Court should issue the requested injunction to protect these public interests.

### IV.   A BALANCING OF THE HARMS WEIGHS DECISIVELY IN FAVOR OF THE PLAINTIFFS.

There are no countervailing harms of any weight to be balanced by the Court. The Defendants do not have any authority to wage war against Iraq absent a Congressional declaration of war or equivalent action by the United States Congress. The requested injunction will prevent the Defendants from illegally and unconstitutionally sending this nation into war.  There is no legally-cognizable harm that can result from such an injunction.

### Conclusion

For the foregoing reasons, the Court should grant Plaintiffs' motion for a preliminary injunction and expedited hearing.

24

Respectfully submitted
JOHN DOE I, *et al.*

By their Attorneys,

*John C. Bonifaz*

John C. Bonifaz (BBO #562478)
Cristobal Bonifaz (BBO #548405)
LAW OFFICES OF CRISTOBAL BONIFAZ
9 Revere Street
Jamaica Plain, MA  02130
(617) 524-2771

and

48 North Pleasant Street
P.O. Box 2488
Amherst, MA  01004
(413) 253-5626

Prof. Margaret Burnham (BBO #066200)
Northeastern Univ. School of Law
400 Huntington Avenue
Boston, MA  02115
(617) 373-8857

Max D. Stern (BBO #479560)
Stern Shapiro Weissberg & Garin
90 Canal Street
Boston, MA  02114-2022
(617) 742-5800

February 13, 2003

CERTIFICATE OF SERVICE

I hereby certify that I caused a true copy of the above document to be
served upon the United States Attorney of record by hand and the
Attorney General of the United States by mail on February 13, 2003.

*John C. Bonifaz*