UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JOHN DOE I, *et al.*,

Plaintiffs,

v.

PRESIDENT GEORGE W. BUSH, *et al.*,

Defendants.

Civil Action
No. 03 CV 10284 JLT

## PLAINTIFFS' REPLY BRIEF

### Introduction

The Plaintiffs respectfully ask this Court to review an extraordinary claim by the President of the United States: that he has unilateral authority under the Constitution to commence a premeditated, preemptive invasion of Iraq before any attack on the United States, its citizens or military or any of its allies has occurred. There is no precedent for such an exercise of presidential power. In the past, significant prolonged combat amounting to war has been initiated only to repel attack, never as a preemptive strike.

The Constitution confers upon Congress, not upon the President, the power to declare war. In the present circumstances, there is an opportunity for Congress to exercise its Constitutional responsibility, as elected representatives of the American people, to determine whether this Nation should go to war with Iraq. It has not yet done so. Before the President commences an undeclared, unconstitutional war, this Court should intervene, and demand compliance with the core Constitutional principle that only

Congress can commit the country to war. Once the President commences war, it will be much more difficult for the Court to intervene.

The President seeks to insulate his war-making activities from any Constitutional accountability by raising three threshold defenses – justiciability, standing and ripeness. The President, however, is not a monarch, and the Constitution's allocation of war powers was designed to restrain his power to commence war in times such as these. The question whether the conditional October 2002 Joint Resolution of Congress (taken alone or in conjunction with previous legislative action) constituted a declaration of war within the meaning of art. 1, § 8 allowing the President, in his sole discretion, to begin a war with Iraq, is a *legal* question of enormous consequence, not a political question outside the scope of judicial power. Now is the right time for the Court to resolve the question. If the Court waits for the war to begin, the President undoubtedly will claim that the question has become moot. The plaintiffs, including soldiers who will be drawn into battle, properly have invoked the Court's jurisdiction to determine whether the President has proper Congressional authority to wage a war against Iraq.

## Argument

### I.    The Plaintiffs' Legal Claims Are Justiciable

#### A.    The Judiciary has reviewed the respective war powers of the President and Congress from this country's founding through the last Gulf War.

The respective powers and responsibilities of Congress and the President in the conduct of war are controversies entirely appropriate for judicial resolution. In *Baker v. Carr*, 369 U.S. 186, 211, 217 (1962), the leading case on the "political question" doctrine, the Supreme Court considered it "error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance," and stated

2

that the nonjusticiability doctrine is "one of 'political questions,' not one of 'political

cases.'" Since the nation's founding, federal courts have reviewed the legality of military

seizures, retaliatory strikes, and covert actions ordered under claims of delegated and

inherent presidential power to conduct warfare. *See, e.g., Little v. Barreme*, 6 U.S. (2

Cranch) 170 (1804); *Brown v. United States*, 12 U.S. (8 Cranch) 110 (1814); *Talbot v.

Seeman*, 5 U.S. (1 Cranch) 1 (1801); *Bas v. Tingy*, 4 U.S. (4 Dall.) 37 (1800). More

recently, in *Dellums v. Bush*, 752 F. Supp. 1141 (D.D.C. 1990), the court declared that it

was "not prepared to read out of the Constitution the clause granting to the Congress, and

to it alone, the authority 'to declare war.'" The *Dellums* court ruled that the

constitutionality of war in the Persian Gulf without congressional authorization was

justiciable and <u>not</u> a "political question." *Id*. at 1146. The Second Circuit reached a

similar conclusion in *Orlando v. Laird*:

> [T]he constitutional delegation of the war-declaring power to the Congress
> contains a discoverable and manageable standard imposing on the
> Congress a duty of mutual participation in the prosecution of war. Judicial
> scrutiny of that duty, therefore, is not foreclosed by the political question
> doctrine.

*Orlando v. Laird,* 443 F.2d 1039, 1042 (2d Cir. 1971) (citing *Baker v. Carr* and *Powell v.

McCormack*, 395 U.S. 486 (1969).[1]

---

[1]     Courts also have determined whether a state of war in fact exists, absent a congressional
declaration, for the purpose of determining whether war risk clauses in insurance contracts have become
applicable. *See, e.g., The Prize Cases*, 67 U.S. (2 Black) 635 (1862); *United States v. Standard Oil Co.*,
178 F.2d 488 (2d Cir. 1949), aff'd 340 U.S. 54 (1950); *Queen Ins. Co. v. Globe & Rutgers Fire Ins. Co.*,
282 F. 976 (2d Cir. 1922, aff'd 263 U.S. 487 (1924); *Pan American World Airways, Inc. v. Aetna Casualty
& Sur. Co.*, 368 F. Supp. 1098 (S.D.N.Y. 1973), aff'd 505 F.2d 989 (2d Cir. 1974); *Hawkins v. State Life
Ins. Co.*, 366 F. Supp. 1031 (E.D. Tenn. 1972). Judicial review of presidential military orders also make it
clear that courts willingly scrutinize the political branches' conduct of war. *See, e.g., The Prize Cases*, 67
U.S. (2 Black) 635, 666–71 (1862); *Martin v. Mott*, 25 U.S. (12 Wheat.) 19, 30 (1827); *cf. United States v.
Curtiss-Wright Export Corp.*, 299 U.S. 304 (1936) (reviewing and sustaining presidential action in the
foreign affairs context as consistent with authority delegated by Congress).

"Resolution of litigation challenging the constitutional authority of one of the three branches cannot be evaded by courts because the issues have political implications …" *INS v. Chadha*, 462 U.S. 919, 943 (1983). Nor does "the fact that one [branch] has mechanisms available to guard against incursions into its power by other [branches] … require that the Judiciary remove itself from the controversy by labeling the issue a political question." *United States v. Munoz-Flores*, 495 U.S. 385, 393 (1990). In times of war, courts have a special duty to ensure that the government does not infringe on constitutional freedoms. *See, e.g., New York Times Co. v. United States*, 403 U.S. 713 (1971).

This court should meet its responsibility to interpret a Congressional statute, be it the October Resolution or the War Powers Resolution, even though it may call into question the constitutionality of the President's proposed actions. "Under the Constitution, one of the Judiciary's characteristic roles is to interpret statutes, and we cannot shirk this responsibility merely because our decision may have significant political overtones." *Japan Whaling Ass'n v. American Cetacean Soc'y*, 478 U.S. 221, 230 (1986); *see also Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803).

> **B.** **The circumstances in this case are dramatically different from those in *Drinan v. Nixon*.**

In *Drinan v. Nixon*, 364 F. Supp. 854 (D. Mass. 1973), this Court held that the plaintiffs' challenge to military activity in Cambodia raised a political question that was not justiciable. This case, however, differs dramatically from the challenged military activity in that case.

The *Drinan* plaintiffs brought their claims as the war in Southeast Asia was winding down. Prior to commencement of that case, Congress already had passed a

series of appropriations financing military operations over the many years of that conflict and repeatedly had extended the military draft. Several courts already had determined that such Congressional actions had ratified and authorized war conducted by President Nixon and his predecessors in Southeast Asia. *See Drinan*, 364 F. Supp. at 858, 859 (citing *Massachusetts v. Laird*, 451 F.2d 26 (1st Cir. 1971); *DaCosta v. Laird*, 471 F.2d 1146 (2d Cir. 1973); *Orlando v. Laird*, 443 F.2d 1039 (2d Cir. 1971)). By the time *Drinan* was decided on August 8, 1973, Congress had enacted legislation disapproving of the bombing of Cambodia, which was vetoed by President Nixon, and then had reached a political compromise with the President that barred the Executive Branch from spending any funds after August 15, 1973, in connection with the bombing of Cambodia (the "August 15 Compromise"). *Drinan*, 364 F. Supp. at 860. In construing the August 15 compromise, in light of the long history of military engagement in Vietnam, this Court found:

> No reasonable interpretation exists for the stipulation of an August 15 cut-off date other than one which presumes that appropriation of funds for Cambodian military activity had been authorized by Congress. Viewed any other way, these acts would be meaningless nullities. As has been pointed out, the courts cannot make such a finding in the face of an alternate construction which has some meaning.

*Id*. at 862 (holding that the August 15 Compromise ratified bombing of Cambodia prior to the cutoff date). This Court recognized that the political branches indeed had reconciled their respective powers and responsibilities, that the plaintiffs sought adjudication of a political question already resolved by the political branches, and that the Court's intervention was not then required.

The *Drinan* court's recognition that the Cambodia bombing was related to the war in Southeast Asia and that the war had been authorized by Congress was crucial to the

5

determination that the suit raised a political question because in either case the

Constitution lodged decisionmaking power to bomb Cambodia in either the President

alone as Commander-in-Chief or in the President and the Congress concurrently.  The

circumstances of the threatened invasion of Iraq are altogether different from the

bombing of Cambodia, and make it clear both that Congress must act before the country

can go to war with Iraq, and that this  Court must intervene to enforce the Constitution's

mandates.  Today, war has yet to commence.  Iraq has not attacked the United States or

any ally.  Unlike this country's entry into hostilities already initiated by others in Korea,

Vietnam, and the first Gulf War, this administration has engaged in prolonged

premeditation and planning for a "preemptive" strike against Iraq, prior to the

commencement of any hostilities by any other nation.  No emergency requires an

immediate response, nor is any timetable for commencing the war driven by any party

but the administration.  Without any external exigency, there is ample time and

opportunity to initiate this war, if war indeed is to be waged, after adherence to clear

constitutional procedures designed to ensure that Congress fully deliberates in a decision

to go to war before the attacks begin.

Unlike in Vietnam, no ongoing war has been ratified by Congressional actions.

Congress has yet to pass any appropriations to fund an invasion of Iraq.  Nor has it

reinstated involuntary conscription to provide military manpower.  Unlike the "August 15

compromise," the October Resolution does not specifically authorize a military invasion

of another country.  Congress has yet to engage in any action that can be considered a

constitutional declaration of war against Iraq.

In purporting to give the President discretion to determine whether to go to war
against Iraq, the October Resolution unlawfully delegates to the President a non-
delegable power held by Congress. The unconstitutionality of the delegation is made all
the more clear by the fact that the October Resolution places no time restriction
whatsoever in "leav[ing] the decision to use force to the discretion of the President."
H.R. Rep. 107-721 at 40. If this transference of war-making authority to the President
were lawful, then a President in the year 2020 could launch a military invasion against
Iraq based solely on the October Resolution passed in 2002.[2]  Such a wholesale transfer

---

[2]      The Defendants proffer the dubious argument that the 1991 act authorizing President George H.W.
Bush to launch the Gulf War – Public Law 102-1 – also can be read to authorize the current President to
commence a major new ground war against Iraq. *See* Defendants' Brief at 11-13. The Defendants fail to
recognize that Public Law 102-1, enacted specifically in response to the invasion of Kuwait by Iraqi troops,
authorized the President to use military force principally to expel Iraq from Kuwait, in accordance with a
series of resolutions passed by the United Nations Security Council in 1990. *See* 105 Stat. 3. The primary
military engagement authorized by Congress under that law – to expel Iraq from Kuwait – terminated no
later than April 11, 1991, when the United Nations declared that the Gulf War officially was over. *See*
Peter Spielmann, *Security Council Ends Gulf War*, Associated Press, April 12, 1991 (reporting that The
United Nations Security Council passed a resolution specifying cease-fire conditions with Iraq on April 3,
1991, and "officially rescinded the state of war" by a second resolution on April 11, 1991, after Iraq
formally accepted the cease-fire conditions); Peter Riddell, Robert Graham and Paul Abrahams, *The Gulf
War; All Hostilities Cease*, Financial Times (London), February 28, 1991, at A1 (reporting that President
George H.W. Bush "officially declared victory and the end of the Gulf war" on February 28, 1991); Pub. L.
105-235 (August 14, 1998), 112 Stat. 1538 (reflecting Congress's understanding that "hostilities in
Operation Desert Storm ended on February 28, 1991, and the conditions governing the cease-fire were
specified in . . . Security Council Resolutions 686 (March 2, 1991) and 687 (April 3, 1991)"). The
subsequent Congressional acts cited by the Defendants, Public Laws 102-190 (1991), 105-235 (1998), and
106-113 (1999), do not infuse Public Law 102-1 with the vitality the Defendants assert. Those resolutions
are remote in time, and contemplate only a measured use of force by the President to enforce certain terms
of the 1991 United Nations truce with Iraq (*e.g.* the enforcement of the no-fly zone) and to protect troops
engaged in that enforcement. Contrary to the Defendants' suggestion, those acts clearly do not constitute,
and were not intended by Congress as, declarations authorizing the President to commence five or more
years hence the colossal military engagement he currently is preparing, namely, a major new ground war
against and continuing occupation of Iraq. Indeed Public Law 105-235, the most recent act of Congress
pertaining specifically to Iraq's noncompliance with United Nations resolutions (prior to the October
Resolution), does not explicitly or even implicitly authorize the President to use military force, much less
wage total war, against Iraq, instead merely "urg[ing]" the President to take "appropriate action . . . *in
accordance with the Constitution and relevant laws of the United States* . . .." 112 Stat. 1541 (emphasis
supplied). Congress's emphasis in Public Law 105-235 that any Presidential action must comply with the
Constitution strongly suggests that Congress authorized the President to take "appropriate action" with the
understanding, and on the condition that, the President would seek a declaration of war before initiating a
full-scale invasion of Iraq.

of Congressional power constitutes "a clear abdication of [Congress's] constitutional responsibilities." *Drinan* at 857.

United States Senator Robert C. Byrd understood that the October Resolution unconstitutionally delegates war-making authority to the President. In his October 10, 2002, remarks on the Senate floor, Senator Byrd described the Resolution as "handing the President unchecked authority to usurp the Constitution and declare war on Iraq." Senator Byrd also stated:

> The President has said on many occasions that he has not yet made up his mind to go to war. When he does make up his mind – if he does – then he should come back to Congress and seek formal authorization. Let him use this Iraq resolution as leverage with the United Nations, if that is what he wants it for, but when it comes time for the United States to undertake military action, let him come back to the Congress for authorization.

148 Cong. Rec. S10233-07 (Oct. 10, 2002) (Statement of Sen. Byrd), *available at* http:\www.westlaw.com.

The constitutional responsibility of Congress under Art. I § 8 is not simply to acquiesce to the President's march toward war. Congressional silence in the face of the Executive Branch's plans for a military invasion is not equivalent to a Congressional declaration of war. In accordance with Article I § 8, Congress affirmatively must decide to send this nation into war where, as here, there is neither an emergency nor an attack against the United States. Congress has yet to make the decision to invade Iraq. Judicial intervention is now necessary to prevent the Defendants from waging war absent a Congressional declaration of war.[3]

---

[3] Even if this Court determines that the October Resolution is not an unconstitutional delegation of Congress's exclusive power to declare war, then this Court must at least acknowledge that, in prescribing standards for the President's exercise of that power, it required U.N. approval before any action as drastic as a ground war and occupation. Representative Tom Allen's (D-ME) comment in the House debate illustrates this understanding: "[The resolution] authorizes the use of force today through the United

(continued...)

8

## II.     Plaintiffs' Legal Claims Are Ripe

A military invasion of Iraq is imminent.  Harm to life and limb of some of the plaintiffs and plaintiffs' children thus also is imminent, as is injury to the legal interests of the plaintiff Members of Congress.  All of the plaintiffs' claims are ripe for adjudication.  They cannot be redressed adequately if this Court delays in reaching the merits of this action.

Under *Abbot Laboratories v. Gardner*, 387 U.S. 136, 149 (1967), the primary questions in determining ripeness are "the fitness of the issues for judicial decision" and "the hardship to the parties of withholding court consideration."  The Supreme Court has since elaborated several factors for assessing whether claims are ripe:

> (1) whether delayed review would cause hardship to the plaintiffs;
> (2) whether judicial intervention would inappropriately interfere with
> further administrative action; and (3) whether the courts would benefit
> from further factual development of the issues presented.

*Ohio Forestry Ass'n., Inc. v. Sierra Club*, 523 U.S. 726, 733 (1998).

Delay would cause unconscionable hardship to the military plaintiffs and their families.  Some of the military plaintiffs already are in the zone of danger.  Others will be sent there soon.  Their families face both the loss of their loved ones and the prospect of living for weeks, months, or even years with the mental anguish of not knowing whether those loved ones will be alive the next day.  The presence of these plaintiffs in this case clearly distinguishes it from *Dellums*, 752 F. Supp. 1141, 1146 (D.D.C. 1990) (dismissing suit by Members of Congress on ripeness grounds).

---

(continued...)

Nations, but it provides no blank check now for unilateral military action" 148 Cong. Rec. H7185 (daily ed. Oct. 8, 2002).  It would therefore be appropriate for this Court to issue a declaratory judgment forbidding war against Iraq absent U.N. approval or further congressional action.

The Congressional plaintiffs also face complete disenfranchisement, a cognizable injury under *Raines v. Byrd*, 521 U.S. 811 (1997). Because a declaration of war or equivalent authorization requires an affirmative act of Congress, legislators opposing the war need only muster a majority in *one* house (or perhaps a large enough minority to sustain a filibuster) to prevail. Thus, before a war begins, the constitutional default condition places the power of commencing war in Congress. If this Court waits until the President actually violates the Constitution by commencing a war, then it will already be too late. Should the President take the country to war, a return to peace would almost certainly require a veto-proof vote of a majority in both houses, under practical circumstances where it clearly will be much more difficult to vote against war. In this regard, the *Dellums* decision on ripeness was mistaken. That court either did not understand the important differences in default positions, or wrongly concluded that Congress was free to decide whether a declaration of war is "prudent" or constitutionally required. *See Dellums*, 752 F. Supp. at 1149–50. In any case, even if such an assertion about congressional discretion were accurate at the time, the Supreme Court has since made it clear that Congress cannot avoid decisions constitutionally assigned to it, particularly when accountability values are at stake. *See New York Times Co. v. United States*, 403 U.S. 713 (1971).

Judicial intervention would not "inappropriately interfere with further administrative action." In fact, the only scenario where such intervention would delay Executive war-making action would be one in which, after this Court issued an injunction, Congress chose not to declare war. If Congress does not wish to commence a war, the Executive has virtually no authority to make war anyway.

Finally, the courts would not "benefit from further factual development of the issues presented." This case presents a *legal* question: whether the Constitution forbids the President from commencing war against Iraq without an express declaration of war by Congress. Further, were this Court to require the development of additional facts before ruling, it improperly would elevate this factor over the other two factors discussed in *Sierra Club*. The magnitude and likelihood of harm to all the plaintiffs increases with every passing day.

The Defendants cannot have it both ways on the ripeness issue. In *Dellums*, the government argued that the plaintiffs' claims were not ripe. In *Conyers v. Reagan*, 578 F. Supp. 324 (D. D.C. 1984), the government argued that the plaintiffs' claims, brought after the invasion of Grenada had begun, were moot. Under this flawed rationale, there is never a time when the plaintiffs' claims in this case could be timely.

This case thus is entirely fit for adjudication. The immediate deployment of troops into the zone of danger in this case is anything but a "contingent future event[]," *Thomas v. Union Carbide Agricultural Products Co.*, 473 U.S. 568, 581 (1985). Just as important, the Members of Congress before this Court seek to perform their branch's fundamental constitutional responsibility, to require careful deliberation by "all the councils of the nation," before sending people like their military co-plaintiffs to die for their country.

### III.    The Plaintiffs Have Standing to Bring Their Claims

#### A.    Each class of plaintiffs has standing.

The plaintiffs satisfy the constitutional requirements for standing. They have "suffered 'injury in fact,' ... the injury is 'fairly traceable' to the actions of the defendant[s], and ... the injury will likely be redressed by a favorable decision." *Bennett*

*v. Spear*, 520 U.S. 154, 162 (1997) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555,

560–61 (1992), and *Valley Forge Christian College v. Americans United for Separation

of Church and State, Inc.*, 454 U.S. 464, 471–72 (1982)); *see also Clinton v. City of New

York*, 524 U.S. 417, 430 n.15 (1998); *Allen v. Wright*, 468 U.S. 737, 751 (1984).

All of the Plaintiffs satisfy the latter two elements. The causal link between the

Defendants' threatened actions and the Plaintiffs' injuries is obvious. The Defendants'

threat to make war against Iraq, without a Congressional declaration of war or equivalent

action, is the direct cause of the danger to the soldier plaintiffs' lives and safety; of the

threat that family members of service members may lose their loved ones and will suffer

mental anguish; and of the potential disenfranchisement of Members of Congress seeking

to perform their constitutional duty. There also is no question that an injunction

prohibiting defendants from engaging in the threatened conduct, or a declaration that

such conduct would violate the Constitution, would redress the plaintiffs' injuries.

As to the first element - injury to the plaintiffs - the primary question in standing

analysis is whether "a party has a sufficient stake in an otherwise justiciable controversy

to obtain judicial resolution of that controversy." *Sierra Club v. Morton*, 405 U.S. 727,

731 (1972). The risk of death or injury confronting the soldier plaintiffs in this case

constitutes precisely such a stake. *See Dept. of Commerce v. United States House of

Representatives*, 119 S.Ct. 765, 772 (1999*); Clinton v. City of New York*, 524 U.S. at 430.

A case litigated by soldiers who face death surely will provide "'that concrete

adverseness which sharpens the presentation of issues upon which the court so largely

depends for illumination of difficult constitutional questions.'" *Flast v. Cohen*, 392 U.S.

83, 99 (1968) (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)). Indeed the lower

courts invariably have found that service members have standing to challenge the constitutionality of a war in which they are ordered to report to the theater of hostilities. *See, e.g., Mottola v. Nixon*, 464 F.2d 178 (9th Cir. 1972); *Berk v. Laird*, 429 F.2d 302, 306 (2d Cir. 1970). Such risks are certainly more concrete and serious than others considered sufficient to confer standing. *See, e.g., Lujan*, 504 U.S. 555 (holding that stake in recreational use and aesthetic enjoyment of environmental resources is sufficient to confer standing).

Moreover, future injuries are perfectly cognizable if, as here, they are "actual or imminent, not 'conjectural' or 'hypothetical.'" *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990) (citations omitted). "One does not have to await the consummation of threatened injury to obtain preventive relief." *Blum v. Yaretsky*, 457 U.S. 991, 1000 (1982). The Defendants repeatedly have suggested that war is "inevitable," and they currently are sending troops to the Persian Gulf region. The possibility of war is more than remote.

The possibility that Congress might actually declare war, and thus place the plaintiffs in danger through constitutional measures, is irrelevant. The injury here is not merely that the plaintiffs face peril, but that unconstitutional action is increasing their exposure to peril. The Supreme Court has made clear that plaintiffs have standing if the injury merely constitutes denial of an opportunity to obtain a benefit or avoid harm. *See Regents of the University of California v. Bakke*, 438 U.S. 265 (1978) 280–81 n.14 (holding that harm was denial of opportunity to compete for particular admission slots); *Metropolitan Washington Airports Auth. v. Citizens for Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 265 (1991) (holding that harm was "[c]reation of an impediment to a reduction in [airport] activity").

13

There also are no prudential reasons for denying standing to the service members. While the questions the service members ask the Court to decide have "broad social import," *Gladstone, Realtors v. Bellwood*, 441 U.S. 91, 99–100 (1979), they involve "individual rights" (their own), and the service members themselves are the "litigants best suited to assert [this] particular claim." *Id.* While a war in Iraq would affect all American citizens, it uniquely and more powerfully would affect soldiers in combat. Accordingly, the soldier plaintiffs' claim that they cannot be sent to fight in an unconstitutional war is neither "abstract" nor a "generalized grievance." *Valley Forge*, 454 U.S. at 474–75; *see Allen*, 468 U.S. at 751; *Gladstone*, 441 U.S. at 99–100.

The Defendants raise a series of objections to plaintiff soldiers' standing. The first, that courts should not award standing to <u>any</u> soldiers, even those ordered to the theater of hostilities, Def. Br. 22, is too extravagant to be maintained. Courts (including this court in *Drinans*) have granted such standing to soldiers on innumerable occasions – any other approach would make even the most outrageous assertions of Executive warmaking power entirely unreviewable.

The Defendants also try to draw a distinction between soldiers ordered to the theater of hostilities and those who are "merely" on active duty. Def. Br. 19–21. This is a distinction without a difference. A soldier on active duty faces a significant threat of being sent to fight, particularly when the nation is contemplating a ground war and occupation. Such a soldier would obviously value his life sufficiently to ensure "concrete adverseness." Defendants cite no authority for the proposition that only the plaintiff with the *absolute* largest stake in a case may have standing, nor could they.

The Defendants' claim that John Doe II also lacks standing, because he has not proven that he has actually been ordered to the theater of hostilities, also fails. While it is true that plaintiffs bear the burden of establishing standing, that burden relates to constructing a successful legal argument, not to providing a polaroid of John Doe II standing next to one of Saddam Hussein's palaces, holding a dated newspaper. The Defendants ask for sufficient information to determine the identity of the Plaintiffs, despite the obvious reasons why such "outing" would be harmful to the Plaintiffs. If the Defendants truly believe that this amount of evidence is necessary, they have established a prima facie case to give some other Plaintiffs third party standing under *NAACP v. Alabama*. In that case, Alabama demanded that the NAACP disclose its membership lists. While the right to keep that information private resided with the members, the Supreme Court gave the NAACP standing, because confining standing to the members would force them to identify themselves by bringing suit. While the Supreme Court does not seem to have contemplated the possibility of a "John Doe" action, it should be clear that protection of the principle in *NAACP v. Alabama* requires either third party standing or a John Doe action.

Applying the same analysis, it is equally clear that the families of military members also suffer injury in fact. Every danger to a soldier constitutes a danger of loss to his family members. In fact the soldiers' family members are more certain to suffer actual injury in the future than the soldiers are. A soldier's relatives will hear only occasionally from the soldier or receive confirmation that he is still alive. Mental anguish will fill the days between these reassurances.

The Plaintiff Members of Congress suffer a concrete injury as well. A significant danger exists that the Defendants, by unconstitutionally commencing a war, will disenfranchise these legislators. This injury resembles the one in *Coleman v. Miller*, 307 U.S. 433 (1939), more than the one in *Raines v. Byrd*, 521 U.S. 811 (1997). (The *Raines* Court reaffirmed the validity of *Coleman*. *Raines*, 521 U.S. at 821–26.) *Coleman* granted standing to Kansas state legislators who claimed that the Lieutenant Governor, by illegally casting the deciding vote to ratify a federal constitutional amendment, nullified their vote. The claim before this Court is strikingly similar to the one *Coleman*. In both cases, the Constitution has vested in a particular government department the right and duty to make a fundamentally important decision. In both cases, an official from another department has allegedly acted (or threatened to act) illegally, in such a way that the legislator plaintiffs must face a much heavier burden in achieving the opposite result than would have been the case if the official had acted legally. Constitutional amendments can be repealed, just as Congress can forbid continuation of a war the Executive has undertaken, but the change in default amounts to disenfranchisement, and therefore confers standing.

The Congressional Plaintiffs also meet *Raines*'s requirements. *Raines* recognized that standing exists in cases where executive action "nullified" a vote of a Member of Congress. 521 U.S. at 826. The *Raines* plaintiffs had had an opportunity to vote on the contested statute, the Line Item Veto Act later struck down in *Clinton v. City of New York*. Here, the Plaintiffs have had no such opportunity. The *Raines* plaintiffs would have an opportunity to vote on future appropriations bills, *without any change in the default rules for passing legislation*; should the *Raines* plaintiffs fail to repeal the Line

Item Veto Act, their future votes would merely be "diluted," not "nullified" (if the President remained free to void particular appropriations, a congressperson's vote was less certain to have effect). *See Raines*, 521 U.S. at 826. Here, the Plaintiffs will confront a different default, should they wish to keep the nation out of war. Instead of merely having to convince a majority of one house of Congress to oppose war, they must either obtain majorities in both houses plus presidential assent, or veto-proof majorities in both houses. *See INS v. Chadha*, 462 U.S. 919 (1983).

### B.   If any one plaintiff has standing, this court need not inquire as to whether the other plaintiffs have standing.

The Supreme Court and the First Circuit have affirmed on numerous occasions that if one party has standing, it does not matter whether other plaintiffs in the case do not. This is so even when Congressional plaintiffs are involved. *See, e.g., Clinton v. City of New York*, 524 U.S. 417, 431 n.19 (1998) ("Because both the City of New York and the health care appellees have standing, we need not consider whether the appellee unions also have standing to sue."); *Bowsher v. Synar*, 478 U.S. 714, 721 (1986) (holding that because members of National Treasury Employees Union had standing, the Court did not need to consider whether the NTEU or Members of Congress also had standing); *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 263–64 (1977) (similar); *Barrows v. Jackson*, 346 U.S. 249 (1953) (similar); *Save Our Heritage, Inc. v. Federal Aviation Administration*, 269 F.3d 49 (1st Cir. 2001) ("It is sufficient for the case to proceed if at least one petitioner has standing.") (citing *Wash. Legal Found. v. Mass. Bar Found.*, 993 F.2d 962, 971–72 (1st Cir. 1993)); *Houlton Citizens' Coalition v. Town of Houlton*, 175 F.3d 178, 183 (1st Cir. 1999) ("It is a settled principle that when one of several co-parties (all of whom make similar arguments) has standing, an appellate

court need not verify the independent standing of the others." (citing *Clinton v. City of New York*, 524 U.S. 417, 431, n.19 (1998)).

### C.    A soldier's family has standing to assert claims involving his rights.

Even if this Court regards the families' claims as relating to a violation of service members' rights, they meet all the requirements for *jus tertii* standing. *Singleton v. Wulff*, 428 U.S. 106, 112 (1976), requires both injury-in-fact (demonstrated *supra*) and satisfaction of prudential considerations. Factors in the latter inquiry include: "the relationship of the litigant to the person whose rights are being asserted; the ability of the person to advance his own rights; and the impact of the litigation on third-party interests." *Caplin & Drysdale, Chartered* v. *United States*, 491 U.S. 617, 623 n.3 (1989). The relationship in this case between soldiers and their families is more intimate than the doctor-patient relationship in *Griswold v. Connecticut*, 381 U.S. 479, 481 (1965) (let alone the relationship between the street-corner contraceptive vendor and the buyer in *Eisenstadt v. Baird*, 405 U.S. 438, 443–46 (1972)). Regardless of whether a particular service member might be able to sue on his own behalf without fear of retribution from superiors, or even to get the case into court in the mad rush of deployment, this Court should recognize that as a general policy matter service members' families can vindicate the soldiers' rights more easily, and that litigation of this sort effectively can protect the rights of soldiers generally.

The Defendants themselves have provided two powerful arguments as to why the family members should have *jus tertii* standing. First, if granting soldiers standing would interfere with the chain of command, then it makes sense to allow the families to sue in their stead. The Defendants cannot have it both ways. Either the soldiers are the best

plaintiffs, or their families are.  Second, if the Defendants believe that the soldiers can only get standing by essentially reveling their identities, then the rule of *NAACP v. Alabama* makes the families the best plaintiffs to assert the soldiers' rights.  There can be no doubt that, should the soldiers be forced to identify themselves, they would face retribution from fellow soldiers and superior officers, if not worse.

### IV.    The President Has No Unilateral Power to Commence War With Iraq

In the last argument of their brief, the Defendants finally address the merits of the plaintiffs' claim.  In doing so, they audaciously assert that the President has "unilateral war-making powers" pursuant to U.S. Const. art. II, § 1, cl. 1 & § 2, cl. 1.  Defendants' Memorandum at 28.  This claim for an imperial presidency is precisely what the Constitution's division of war powers and responsibilities between Congress and the Presidency is designed to prevent.  The Defendants would have this Court treat U.S. Const. art. 1, § 8, giving Congress the power to declare war, as mere surplusage.  Even a lesser claim in *Dellums* – that "the Executive had the sole power to determine that any particular offensive military operation, no matter how vast, does not constitute was-making, but only an offensive military attack" -- was roundly rejected as "far too sweeping to be accepted by the courts." *Dellums*, 752 F. Supp. at 1144-1145. "Such an interpretation would evade the plain language of the Constitution." *Id.*

Missile strikes at Iraq and police or peace-keeping exercises in places like Kosovo, Somalia, Haiti and Panama, engaged in by past administrations, *see* Defendants' Memorandum at 30-31, are not precedent for the war planned by this administration. These were limited actions, many of which had specific Congressional authorization or were not challenged either by Congress or in courts.  They pale in nature and scope to the

proposed commitment to a major ground war and occupation of Iraq with hundreds of

thousands of troops.  If ever a constitutional role for Congress in the initiation of war is

required, it is in these circumstances.  The plaintiffs rely on their initial brief as to why

the October resolution fails to constitutionally authorize President Bush's proposed war.

They vigorously dispute that the President's own constitutional powers, Supreme Court

precedent,[4] Executive and Legislative Branch past practice or the October resolution

suffice to authorize the imminent first strike war against Iraq.

Respectfully submitted,

John C. Bonifaz (BBO #562478)
Cristobal Bonifaz (BBO #548405)
LAW OFFICES OF CRISTOBAL BONIFAZ
9 Revere Street
Jamaica Plain, MA  02130
(617) 524-2771

and

48 North Pleasant Street
P.O. Box 2488
Amherst, MA  01004
(413) 253-5626

Prof. Margaret Burnham (BBO #066200)
Northeastern Univ. School of Law
400 Huntington Avenue
Boston, MA  02115
(617) 373-8857

Max D. Stern (BBO #479560)
Stern Shapiro Weissberg & Garin

---

[4]     The Supreme Court cases cited by the Defendants to support their claim of unilateral presidential war-making power, *United States v. Sweeney*, 157 U.S. 281 (1895) and *Fleming v. Page*, 50 U.S. (9 How. ) 603 (1850), each address issues related to the war with Mexico, specifically authorized by Congress, c. 16, 9 Stat 9 (May 13, 1846), and do not support the proposition for which they are cited.

90 Canal Street
Boston, MA  02114-2022
(617) 742-5800

February 21, 2003

CERTIFICATE OF SERVICE

I hereby certify that I caused a true copy of the above document to be
served upon the attorney of record for each other party by hand on ement und Fed-Ex
February 21, 2003.

John C Bonifaz

21